UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JONATHAN DeLEON,

Plaintiff,

v.

9:26-CV-1378
(BKS/DJS)

SUPERINTENDENT KING, et al.,

Defendants.

---

APPEARANCES:

JONATHAN DeLEON
Plaintiff, pro se
19-A-2396
Clinton Correctional Facility
P.O. Box 2001
Dannemora, NY 12929

BRENDA K. SANNES
Chief United States District Judge

**DECISION and ORDER**

## I. INTRODUCTION

The Clerk has sent to the Court for review a complaint submitted by pro se plaintiff Jonathan DeLeon asserting claims pursuant to 42 U.S.C. § 1983 ("Section 1983") and Title II of the Americans With Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"), together with an application to proceed in forma pauperis ("IFP") and a motion for injunctive relief. Dkt. No. 1

("Compl."); Dkt. No. 5 ("IFP Application"); Dkt. No. 3 ("Motion for Injunctive Relief").[1] Plaintiff, who is incarcerated at Clinton Correctional Facility, has not paid the filing fee for this action.[2]

## II. IFP APPLICATION

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, No. 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).[3] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Id*. (citing 28 U.S.C. § 1915(b) and *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

Upon review, the Court finds that plaintiff has submitted a completed and signed IFP Application (Dkt. No. 5) which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2).

---

[1] By Order entered on July 15, 2026, this action was administratively closed based on plaintiff's failure to comply with the filing fee requirement. Dkt. No. 4. Thereafter, plaintiff filed the inmate authorization form required in this District and the IFP Application and the Clerk was directed to reopen this action and restore it to the Court's active docket. Dkt. Nos. 5, 6, 7.

[2] Plaintiff currently has one other action pending in this District. *See DeLeon v. Corro*, 9:25-CV-0140 (BKS/CBF) (N.D.N.D. filed Jan. 30, 2025) ("*DeLeon I*"). That action is based on alleged wrongdoing that occurred between October and November 2024, while plaintiff was incarcerated at Clinton Correctional Facility. *Id*., Dkt. No. 38.

[3] Section 1915(g) prohibits a prisoner from proceeding in forma pauperis where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions or appeals that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. 28 U.S.C. § 1915(g). Based upon the Court's review of plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it does not appear that plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g).

Plaintiff has also filed the inmate authorization form required in this District. Dkt. No. 6. Accordingly, plaintiff's IFP Application is granted.

## III. SUFFICIENCY OF THE COMPLAINT

### A. Governing Legal Standard

Section 1915(e) directs that, when a plaintiff seeks to proceed in forma pauperis, "(2) . . . the court shall dismiss the case at any time if the court determines that – . . . (B) the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[4] Thus, even if a plaintiff meets the financial criteria to commence an action in forma pauperis, it is the court's responsibility to determine whether the plaintiff may properly maintain the complaint that he filed in this District before the court may permit the plaintiff to proceed with this action in forma pauperis. *See id*.

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d

[4] To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989).

Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

In reviewing a pro se complaint, the court has a duty to show liberality toward pro se litigants, *see Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution . . . in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (internal citations omitted). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id*. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. (citing *Twombly*, 550 U.S. at 555). "[W]here the well-pleaded facts do not

permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id*. (internal quotation marks and alterations omitted).

### B. Summary of the Complaint

The complaint asserts allegations of wrongdoing that occurred while plaintiff was incarcerated at Clinton Correctional Facility, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"). *See generally* Compl. Plaintiff's complaint is replete with rambling and repetitive allegations of wrongdoing, which are at times conclusory in nature, and difficult to comprehend. For example, the pleading alleges that over a period of several months, a number of different corrections officials discharged a homemade, diluted chemical agent into plaintiff's cell on a daily basis, utilizing a nasal spray bottle, apparently from locations above and below the cell. In addition, the pleading references events that are the subject of, or relate to the same time period as, the alleged wrongdoing in *DeLeon I*.[5] Notwithstanding these deficiencies, the Court has carefully

---

[5] Insofar as the pleading includes references to events that are the subject of *DeLeon I*, or occurred at correctional facilities other than Clinton Correctional Facility involving officials other than the named defendants, the Court declines to summarize those events herein. The Court will simply note that allegations of wrongdoing that relate to, or arise out of the same time period as, the allegations of wrongdoing in *DeLeon I* should have

reviewed the complaint for purposes of Sections 1915 and 1915A, mindful of the Second Circuit's instruction to extend special solicitude to pro se litigants and liberally construe their pleadings. The following facts are set forth as alleged in the complaint.[6]

On or around October 20, 2024, plaintiff purchased a charger from JPay, a prison service provider. Compl. at 7. Plaintiff apparently never received the charger and filed a missing property claim, which also sought reimbursement for a missing package. *Id.* On or around December 15, 2024, defendant Corrections Sergeant Allen brought plaintiff the charger and had plaintiff sign a memorandum acknowledging receipt of it and withdrawing his missing property claim. *Id.* On or about January 8, 2025, plaintiff received a notice that his missing package claim was withdrawn. *Id.* The notice used "the same memorandum" that defendant Allen had plaintiff sign to indicate that his charger was found. *Id.* Plaintiff believes defendant Allen created this false memorandum in retaliation for plaintiff commencing *DeLeon I*. *Id.*

Between November 6, 2024, and December 28, 2025, plaintiff wrote letters to defendant Superintendent King regarding his confinement conditions and harassment he was

---

been asserted in that action, wherein plaintiff was already afforded leave to amend and a motion for summary judgment is now pending. *See DeLeon I*, Dkt. Nos. 53, 58. In addition, insofar as the complaint asserts allegations of wrongdoing that occurred at a correctional facility other than Clinton Correctional Facility, he must pursue such claims in a separate action in the appropriate court.

[6] Plaintiff has attached over 150 pages of exhibits. *See* Compl. at 67-223. The majority of those documents relate to events that are the subject of, or cover the same time period (or earlier) as, the alleged wrongdoing in *DeLeon I*. Nonetheless, the Court has also considered these documents as part of its sufficiency review herein.

experiencing from defendants Allen, Corrections Officer Baker, Corrections Officer Tamer, Corrections Officer Wilcox, Corrections Officer Charly, Corrections Officer Giddins, and Nurse Uma. Compl. at 7-8. These officials also encouraged other inmates to harass plaintiff and "sprayed" plaintiff "with an unknown substance" on a "daily basis," which "burn[ed]" his skin. *Id.* at 8. This issue was not addressed, and defendants King and Grievance Coordinator Donna Wilcox failed to process plaintiff's grievance as a cover up. *Id.* at 8.

On March 10, 2025, defendant Corrections Officer A. Martin "had another inmate" enter plaintiff's cell and "steal a block of cheese" based on plaintiff filing a lawsuit and grievances against this official. Compl. at 16.

On or around May 9, 2025, defendant Corrections Officer Wilcox opened plaintiff's cell door even though plaintiff did not place his name on the chow list in order to set up a fight between plaintiff and another unidentified inmate. Compl. at 11. This apparently happened two additional times over the ensuing days, with defendants Wilcox and Charly both "encorageing [sic] inmates to harass [plaintiff]" and "call [him] a rat and target [him.]" *Id.*

In June or July 2025, defendant Grievance Coordinator Wilcox "lied on a[n] affidavit stating that [plaintiff] did not file[ ] any grievances . . . to cover . . . [the] misconduct and retaliation being done to [him]." Compl. at 14.

On or about August 12, 2025, plaintiff was deprived of a package. Compl. at 7-8, 10, 13. The next day, defendants Baker and Giddins encouraged inmates to "verbaly [sic] insult" plaintiff and told plaintiff that he would not receive his package. *Id.* at 13. Thereafter,

defendant Allen again used the "withdrawal memorandum" that plaintiff signed when he acknowledged receipt of his charger to indicate that plaintiff was withdrawing his claim for a missing package. *Id.* at 10. Defendant Corrections Sergeant Ortiz was somehow also involved in this conduct. *Id.*

On or around August 16, 2025, plaintiff asked defendant Giddins about his package, and defendant Giddins responded that he did not work in packages. Compl. at 16. Thereafter, defendant Giddins informed another inmate that plaintiff would not receive his package. *Id.* Plaintiff then asked defendant Corrections Officer Baker about the package and this official stated that he would check on it. *Id.* Defendant Baker then walked away and in "a loud voice" stated that plaintiff would not receive his package. *Id.*

Plaintiff subsequently wrote to defendant King regarding the matter and received a response on or around September 7, 2025, wherein defendant King "claim[ed] [that plaintiff's] package was spoiled and had to be destroyed[.]" Compl. at 10. However, none of the items in the package were perishable. *Id.*

On September 8, 2025, plaintiff wrote a grievance against defendant Giddins. Compl. at 17. On or about September 20, 2025, at approximately 10:00 a.m., defendants Giddins and Baker "single[d] [plaintiff] out" and "ha[d] inmates target [him.]" *Id.*

On September 13, 2025, at 3:15 p.m., plaintiff utilized a curtain to block visibility into his cell while he was using the bathroom. Compl. at 17-18. Defendant Corrections Officer Moran stopped at plaintiff's cell and told him to remove the curtain. *Id.* at 18. Plaintiff stated

that he could not because he was using the bathroom. *Id.* Defendant Moran then removed the curtain and thereafter wrote plaintiff a misbehavior report even though other inmates also utilize a curtain for the same purpose. *Id.* at 17-18.

On October 23, 2025, defendant Corrections Lieutenant Malark refused to honor plaintiff's request to call defendant Moran as a witness during plaintiff's disciplinary hearing to testify regarding the number of state issued pants in plaintiff's cell. Compl. at 18-19.

On or about November 5, 2025, defendant Charly "spray[ed] an unknown substance into [plaintiff's] cell to annoy [him.]" Compl. at 12. On November 11, 2025, other inmates in the messhall harassed plaintiff and called him a rat at the direction of defendant Tamer. Compl. at 13. The harassment "lead to a fight." *Id.*

On November 21, 2025, defendant Wilcox "started to spray" plaintiff because one of plaintiff's children is named "Sky." Compl. at 22.

On December 1, 2025, plaintiff was "returning from P.C. rec" and "stop[ped] to ask for a cigarette." Compl. at 17. Defendant Giddins told plaintiff, "in a harassing manner[,]" that "he was going to write [plaintiff] a ticket for stopping." *Id.* Although plaintiff continued walking to his cell, he was subsequently issued a ticket. *Id.*

On December 5, 2025, defendant Malark found plaintiff guilty of the charges brought against him by defendant Giddins even though plaintiff explained during his hearing that the charges were baseless. Compl. at 19. Plaintiff lost tablet and commissary privileges for an unidentified period of time as a result of the guilty determination. *Id.* at 19, 61.

On or about December 6, 2025, defendants Charly and Corrections Officer Wilcox did not open plaintiff's cell even though he put his name on the callout list for chow. Compl. at 11. The next morning, defendant Moran indicated that plaintiff's name was not on the callout list for chow and refused to open his cell to let him out even though plaintiff asked defendant Charly to place his name on the callout list earlier that morning. *Id.* This happened again on the morning of December 20 and December 21, 2025, when defendant Charly prepared the callout list and failed to place plaintiff on the list. *Id.* Plaintiff believes this happened because he submitted a grievance against defendants Charly and Wilcox on May 14, 2025, which "Supervisor Donna Wilcox" failed to file. *Id.*

On December 19, 2025, defendant Corrections Officer Wilcox issued plaintiff a misbehavior report for not turning on the light in his cell even though other inmates on the block "also do not turn their light on[.]" Compl. at 18. Plaintiff was found guilty of the charge and "received 45 days loss of packages." *Id.* at 61.

On December 20, 2025, defendants Nurse John Doe and Nurse Jane Doe encouraged other inmates to insult plaintiff after attending to him. Compl. at 30.

On December 21, 2025, defendant Corrections Sergeant Corrow, who is named as a defendant in *DeLeon I*, "encourage[d]" unidentified corrections officials in the messhall to harass plaintiff and call him a rat. Compl. at 15.

On December 22, 2025, defendant Corrections Officer Wilcox served plaintiff with a Tier I misbehavior report "for not having [his] light on during count" three days earlier even

though plaintiff's light was on. Compl. at 12. Thereafter, defendant Corrections Sergeant John Doe visited plaintiff at his cell and asked how he wanted to plead to the disciplinary charge. *Id.* Plaintiff stated that he was pleading "not guilty" and defendant John Doe responded that plaintiff would receive a less harsh punishment if he pleaded guilty, and that he would be found guilty either way. *Id.*

On December 28, 2025, at approximately 6:45 a.m., defendant Corrow acknowledged his awareness that plaintiff was at times not being allowed out of his cell for meals, and informed plaintiff that it was because he is "a rat" for filing a lawsuit. Compl. at 15.

On January 10, 2026, at approximately 11:00 a.m., two inmates provoked plaintiff to fight them at the direction of defendant Tamer. Compl. at 13. A few hours later, the same two inmates "again was trying to fight and provoke [plaintiff]" due to defendant Tamer "insult[ing]" plaintiff. *Id.* One of these inmates told plaintiff to "swing" while corrections officials, including defendant Tamer, looked on and did nothing. *Id.* After "over a minute[,]" defendant Tamer told plaintiff to punch the inmate in the face and the issue would be over. *Id.* Later that day, plaintiff wrote to defendant King regarding the matter, which was never addressed. *Id.* at 23.

On February 12, 2026, plaintiff received a ticket from defendant Corrections Officer Wilcox for "count violation . . . for sleeping on the count[,]" which he believes was retaliatory. Compl. at 12, 18. Plaintiff was issued a ticket even though other inmates who "also take mental health medication" sleep during count. *Id.* at 18.

On February 20, 2026, plaintiff attended a disciplinary hearing before defendant Malark. Compl. at 19. Although plaintiff introduced testimony from mental health nurses that his mental health medication causes drowsiness, defendant Malark found plaintiff guilty of sleeping during count. *Id.*

Later that day, at approximately 10:00 p.m., defendant Corrections Officer Wilcox "had inmates verbally harassing [plaintiff]" and turned off the power in his cell because plaintiff submitted a grievance against this official on May 10, 2025. Compl. at 14. Defendant Wilcox informed plaintiff that if he "behave[d,]" the power would be turned back on. *Id.* Plaintiff was without power for two days at the direction of defendants Wilcox and Charly. *Id.*

On or around February 22, 2026, defendant Corrections Officer Lancaster placed plaintiff's outgoing legal mail in a box. Compl. at 60. The mail was returned to plaintiff roughly two and a half months later. *Id.*

On or around February 27, 2026, at approximately 5:45 a.m., defendant Lancaster sprayed plaintiff "with a chemical that burn[ed] [his] skin" using "a nasal spray bottle." Compl. at 41.

On or around March 10, 2026, defendant Tamer "ha[d] [plaintiff] move[d] back to 1 Company from 7 Company E-Block." Compl. at 21. Following the move, defendants Tamers and Corrections Officer John Doe #1 encouraged other inmates to harass plaintiff and discharged a substance in a nasal spray bottle that burned plaintiff's skin. *Id.*

On March 21, 2026, at approximately 10:00 p.m., defendants Charly and Wilcox turned off the power in plaintiff's cell again, and he was without power until the next day at 3:00 p.m. Compl. at 14.

On April 18 and April 19, 2026, defendant Charly sprayed water into plaintiff's cell "from above to annoy [him.]" Compl. at 12. That same day, defendants Giddins, John Doe #1, and Corrections Officer Reyes "incited [plaintiff]" to fight with one or more unidentified individuals "while spraying th[e] unknown substance into [his] cell[.]" *Id.* at 46.

On April 20, 2026, defendant Corrections Officer Wilcox stopped at plaintiff's cell and attempted to punch plaintiff through the cell bars. Compl. at 20. Plaintiff asked defendant Wilcox why his body camera was not on and defendant Wilcox responded with a harassing statement. *Id.*

On or around April 30, 2026, defendant Lancaster sprayed plaintiff at 1:00 a.m. from the cellblock area under plaintiff's cell. Compl. at 46. Plaintiff told defendant Lancaster to "stop" spraying him, and defendant Lancaster responded by stating, "you know what you gotta do" in an effort to provoke plaintiff to start a fight "to go to the box." *Id.*

On or around May 12, 2026, between 11:00 p.m. and 11:15 p.m., defendant Lancaster sprayed plaintiff with "O.C. chemicals that he sprays in a nasal bottle spray" from the floor above plaintiff's cell. Compl. at 31. Defendant Lancaster proceeded to "spray every 15 minutes" while "stand[ing]" and "insulting [plaintiff.]" *Id.*

On May 18, 2026, defendants Giddins, Corrections Officer John Doe #1, and Corrections Officer Reyes caused inmates to harass plaintiff and told one inmate that he would not be punished if he assaulted plaintiff. Compl. at 20, 59. These officials and defendant Corrections Officer Poiner also sprayed an unknown substance into plaintiff's cell and made comments about him filing grievances. *Id.* at 20-21, 37. Later that day, plaintiff's laundry, which was normally delivered to him at his cell, was left outside of the cell. *Id.* at 21-22. When plaintiff exited his cell, he was assaulted by inmate Weber. *Id.* at 21-22. Inmate Weber attempted "to stab [plaintiff's] eye out with a fork." *Id.* at 28. Defendants Giddins, John Doe #1, Corrections Officer John Doe #2, and Poiner were aware that the assault "was going to happen" because they encouraged inmate Weber's conduct, and defendant Poiner, who was stationed nearby, did not stop the fight while it was ongoing, and while inmate Weber was punching plaintiff in the face. *Id.* at 28, 38.

On June 4, 2026, defendant Tamer stopped at plaintiff's cell while defendant John Doe #1 "spray[ed]" an "unknown substance" into plaintiff's cell from another location. Compl. at 24. Defendant Tamer also told plaintiff that he was "insane" for complaining about the spraying because "no one was spraying anything," and threatened to have him placed on suicide watch if he continued with his complaints. *Id.* On June 5, 2026, plaintiff reported these actions to defendant King. *Id.* at 25.

On or around June 12, 2026, at approximately 7:30 a.m., defendant Nurse Beltran "pretend[ed] to talk to another inmate saying [plaintiff's] family's names" and that plaintiff

sexually assaulted his family based on plaintiff filing grievances against other officials. Compl. at 52.

Later that day plaintiff removed fecal matter from the toilet in his cell and threw it out of his cell hoping that officials would "stop spraying" him. Compl. at 25. Plaintiff was then moved to the 6 Company E-Block where defendants Allen and Ortiz were stationed. *Id.* Defendant Nurse Jane Doe was called and this official arrived at the scene and asked plaintiff if he was suicidal or wanted to hurt anyone else. *Id.* Plaintiff answered "no" to these questions. *Id.* Defendants Allen, Ortiz, Tamer, and Wilcox then "started to insult" plaintiff and told him that he would be placed on suicide watch for the night. *Id.* Plaintiff was also strip searched by these officials. *Id.* at 33.

Plaintiff was then moved to a suicide watch cell, where he remained until the afternoon of June 15, 2026. Compl. at 25. During this time, plaintiff slept on a "dirty mattress that had blood stains" and the lights in the cell were "very bright," which resulted in plaintiff experiencing headaches and loss of sleep. *Id.* at 26, 34.

On or around June 16, 2026, plaintiff was issued a misbehavior report from defendant Tamer "for throwing toilet water out [of his] cell" "do [sic] to being provoke[d.]" Compl. at 55, 62. Thereafter, defendant Corrections Lieutenant Mason apparently found plaintiff guilty of the charge(s) in the misbehavior report and sentenced him to 60 days loss of package and commissary privileges in order to "force [plaintiff] to go to the messhall[.]" *Id.* at 55-56.

On June 21, 2026, defendant Lancaster again sprayed plaintiff with an unknown substance multiple times from the floor above plaintiff's cell and encouraged other inmates to harass plaintiff. Compl. at 31-32.

On June 30, 2026, an inmate in "O.B.S. 19 cell 6 company" apparently stabbed plaintiff twice. Compl. at 56. Plaintiff believes defendants Tamer and Corrections Officer Jane Doe "instructed" the assault through their "insults" directed at plaintiff. *Id.*

The compound being sprayed at plaintiff is not dispensed from a canister but rather is being mixed with water in a nasal spray bottle so that it is less potent and detectable. Compl. at 26. The spray burns plaintiff's skin "for seconds at a time . . . like some kind of prank." *Id.*

On a "daily" basis, defendants Nurse Uma, Nurse Beltran, Nurse Jane Doe, Corrections Officer Jane Doe, Corrections Officer Tamer, and Corrections Officer Moran encouraged inmates to insult plaintiff and harassed him by "mention[ing] [his] family names" in response to his engagement in protected activity. Compl. at 51.

Liberally construed, the complaint asserts the following claims against the named defendants in their individual and official capacities: (1) a First Amendment retaliation claim against defendant Allen based on creating a false memorandum that deprived plaintiff of personal property ("First Retaliation Claim"); (2) a First Amendment retaliation claim against defendant A. Martin based on this official allowing another inmate to "steal a block of cheese" from plaintiff ("Second Retaliation Claim"); (3) First Amendment retaliation claims against defendants Charly and Corrections Officer Wilcox based on these officials calling plaintiff a

"rat" in the presence of other inmates and facilitating an altercation between plaintiff and another inmate ("Third Retaliation Claim"); (4) a First Amendment retaliation claim against Grievance Coordinator Wilcox based on this official making a false statement in an affidavit to cover up the misconduct of others ("Fourth Retaliation Claim"); (5) First Amendment retaliation claims against defendants Giddins and Baker based on these officials encouraging other inmates to "target" plaintiff ("Fifth Retaliation Claim"); (6) a First Amendment retaliation claim against defendant Giddins based on issuing plaintiff a false misbehavior report on December 1, 2025 ("Sixth Retaliation Claim"); (7) First Amendment retaliation claims against defendants Charly and Corrections Officer Wilcox based on denying plaintiff access to meals on three occasions ("Seventh Retaliation Claim"); (8) a First Amendment retaliation claim against defendant Wilcox based on issuing plaintiff a misbehavior report for not turning on the light in his cell ("Eighth Retaliation Claim"); (9) a First Amendment retaliation claim against defendant Corrow based on this official "encourag[ing]" unidentified corrections officials in the messhall to harass plaintiff and call him a rat on December 21, 2025 ("Ninth Retaliation Claim"); (10) a First Amendment retaliation claim against Corrections Officer Wilcox for issuing plaintiff a misbehavior report for not having his light on during count ("Tenth Retaliation Claim"); (11) a First Amendment retaliation claim against defendant Corrow based on this official participating in denying plaintiff access to meals in December 2025 ("Eleventh Retaliation Claim"); (12) a First Amendment retaliation claim against defendant Corrections Officer Wilcox for issuing plaintiff a misbehavior report for sleeping on count ("Twelfth

Retaliation Claim"); (13) First Amendment retaliation claims against defendants Charly and Corrections Officer Wilcox based on turning off the power in plaintiff's cell on February 20 and March 21, 2026 ("Thirteenth Retaliation Claim"); (14) a First Amendment retaliation claim against Nurse Beltran based on reciting the names of plaintiff's family members aloud and accusing plaintiff of sexually assaulting his family ("Fourteenth Retaliation Claim"); (15) First Amendment retaliation claims against Nurse Uma, Nurse Beltran, Nurse Jane Doe, Corrections Officer Jane Doe, Corrections Officer Tamer, and Corrections Officer Moran based on these officials encouraging inmates to insult plaintiff and harassing plaintiff ("Fifteenth Retaliation Claim"); (16) a First Amendment mail tampering claim against defendant Lancaster; (17) Fourth Amendment unlawful search claims against defendants Allen, Ortiz, Tamer, and Corrections Officer Wilcox; (18) Eighth Amendment excessive force claims against defendants Allen, Baker, Tamer, Corrections Officer Wilcox, Charly, Giddins, and Nurse Uma based on "spray[ing]" plaintiff "with an unknown substance" on a "daily basis" ("First Excessive Force Claim"); (19) an Eighth Amendment excessive force claim against defendant Lancaster based on using "a nasal spray bottle" to spray plaintiff "with a chemical that burn[ed] [his] skin" on or around February 27, 2026 ("Second Excessive Force Claim"); (20) Eighth Amendment excessive force claims against defendants Tamer and John Doe #1 based on using "a nasal spray bottle" to spray plaintiff "with a chemical that burn[ed] [his] skin" on or around March 10, 2026 ("Third Excessive Force Claim"); (21) an Eighth Amendment excessive force claim against John Doe #1 based on "spray[ing]" an "unknown

substance" into plaintiff's cell on June 4, 2026 ("Fourth Excessive Force Claim"); (22) Eighth Amendment excessive force claims against defendant Lancaster based on spraying plaintiff with an unknown substance in April, May, and June 2026 ("Fifth Excessive Force Claim"); (23) Eighth Amendment failure-to-protect claims against defendants Charly and Corrections Officer Wilcox based on calling plaintiff a "rat" in the presence of other inmates and facilitating an altercation between plaintiff and another inmate in May 2025 ("First Failure-to-Protect Claim"); (24) an Eighth Amendment failure-to-protect claim against defendant Tamer based on encouraging other inmates to harass plaintiff, which "lead to a fight" on November 11, 2025 ("Second Failure-to-Protect Claim"); (25) Eighth Amendment failure-to-protect claims against Nurse John Doe and Nurse Jane Doe based on encouraging other inmates to insult plaintiff on December 20, 2025 ("Third Failure-to-Protect Claim"); (26) an Eighth Amendment failure-to-protect claim against defendant Tamer based on encouraging inmates to assault plaintiff on January 10, 2026 ("Fourth Failure-to-Protect Claim"); (27) Eighth Amendment failure-to-protect claims against defendants Giddins, John Doe, and Corrections Officer Reyes based on "incit[ing] [plaintiff]" to fight with one or more unidentified individuals in April 2026 ("Fifth Failure-to-Protect Claim"); (28) Eighth Amendment failure-to-protect claims against defendants Giddins, Poiner, Reyes, Corrections Officer John Doe #1, and Corrections Officer John Doe #2 based on facilitating an assault against plaintiff on May 18, 2026 ("Sixth Failure-to-Protect Claim"); (29) Eighth Amendment failure-to-protect claims against defendants Tamer and Corrections Officer Jane Doe based on these officials

directing "insults" at plaintiff and the subsequent assault against him by another inmate on June 30, 2026 ("Seventh Failure-to-Protect Claim"); (30) Eighth Amendment failure-to-protect claims against defendants Nurse Uma, Nurse Beltran, Nurse Jane Doe, Corrections Officer Jane Doe, Corrections Officer Tamer, and Corrections Officer Moran based on encouraging inmates to insult plaintiff and harassing plaintiff ("Eighth Failure-to-Protect Claim"); (31) Eighth Amendment conditions-of-confinement claims against defendants Charly and Corrections Officer Wilcox based on denying plaintiff access to meals on three occasions ("First Conditions-of-Confinement Claim"); (32) Eighth Amendment conditions-of-confinement claims against defendants Allen, Ortiz, Tamer, Corrections Officer Wilcox, and Nurse Jane Doe based on placing plaintiff in an unsanitary, illuminated suicide watch cell for two days ("Second Conditions-of-Confinement Claim"); (33) a Fourteenth Amendment disciplinary due process claim against defendant Malark arising from plaintiff's disciplinary hearing on October 23, 2025 ("First Disciplinary Due Process Claim"); (34) Fourteenth Amendment disciplinary due process claims against defendants Giddins and Malark arising out of the misbehavior report issued on December 1, 2025 ("Second Disciplinary Due Process Claim"); (35) a Fourteenth Amendment due process claim against defendant Corrections Sergeant John Doe for pressuring plaintiff into pleading guilty to the misbehavior report issued by Corrections Officer Wilcox on December 22, 2025 ("Third Disciplinary Due Process Claim"); (36) a Fourteenth Amendment disciplinary due process claim against defendant Malark related to plaintiff's disciplinary hearing on February 20, 2026 ("Fourth Disciplinary Due Process

Claim"); (37) Fourteenth Amendment disciplinary due process claims against defendants Tamer and Mason arising out of plaintiff's disciplinary hearing in June 2026 ("Fifth Disciplinary Due Process Claim"); (38) Fourteenth Amendment destruction of property claims against defendants Baker, Giddins, Ortiz, and King based on these officials depriving plaintiff of access to a non-perishable package; (39) a Fourteenth Amendment due process claim against defendant Grievance Coordinator Wilcox based on denying plaintiff access to grievance channels; (40) a Fourteenth Amendment equal protection claim against defendant Moran based on issuing plaintiff a misbehavior report for utilizing a privacy curtain ("First Equal Protection Claim"); (41) a Fourteenth Amendment equal protection claim against defendant Corrections Officer Wilcox for issuing plaintiff a misbehavior report for sleeping on count ("Second Equal Protection Claim"); (42) a Fourteenth Amendment equal protection claim against defendant Corrections Officer Wilcox based on issuing plaintiff a misbehavior report for not turning on the light in his cell ("Third Equal Protection Claim"); (43) ADA claims based on the failure to properly accommodate plaintiff's mental health condition; and (44) supervisory liability claims against defendants King and Grievance Coordinator Wilcox based on these officials failing to remedy the wrongdoing of other officials.

For a more complete statement of plaintiff's claims, reference is made to the complaint.

**C. Analysis**

"Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted). "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted).

If a defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of respondeat superior) is insufficient to show his or her personal involvement in that unlawful conduct. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003); *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Instead, "a plaintiff must plead and prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.'" *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Iqbal*, 556 U.S. at 676 and holding that "there is no special rule for supervisory liability").

**1. Retaliation Claims**

Courts must approach claims of retaliation "'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official–even those otherwise not rising to the level of a constitutional violation–can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). To state a plausible claim, a plaintiff asserting a First Amendment retaliation claim must advance "non-conclusory" allegations establishing "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech [or conduct] and the adverse action." *Davis*, 320 F.3d at 352 (quoting *Dawes*, 239 F.3d at 492). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, *see Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), the Court finds that plaintiff's First Retaliation Claim, Third Retaliation Claim, Sixth Retaliation Claim, Seventh Retaliation Claim, Eleventh Retaliation Claim, and Thirteenth Retaliation Claim survive sua sponte review and require a response.

In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

The Court, however, reaches a different conclusion with respect to plaintiff's remaining retaliation claims for the reasons that follow.

**a. Second Retaliation Claim**

Insofar as the complaint alleges that defendant A. Martin allowed another inmate to "steal a block of cheese" from plaintiff, the pleading does not include any details regarding (1) how defendant A. Martin aided another inmate in stealing from plaintiff, (2) how plaintiff became aware of defendant A. Martin's alleged misconduct, (3) why plaintiff believes this alleged wrongdoing was in response to his engagement in protected activity, or (4) the specific protected activity about which defendant A. Martin was aware. Furthermore, setting aside issues of personal involvement and motivation, the alleged harm does not rise to the level of "adverse action." *See, e.g.*, *Cisse v. Bliss*, No. 9:23-CV-0697 (MAD/ML), 2024 WL 5378988, at *10 (N.D.N.Y. Nov. 15, 2024) ("Courts have consistently held that taking food out of a plaintiff's cell on one occasion constitutes de minimis conduct and does not amount to an adverse action." (collecting cases)), *report and recommendation adopted by* 2025 WL 97683 (N.D.N.Y. Jan. 15, 2025); *Hamilton v. New York State Dep't of Corr. & Cmty. Supervision*, No. 9:18-CV-1312, 2018 WL 11574454, *9 (N.D.N.Y. Dec. 17, 2018) (noting that the denial of a single religious meal in prison "do[es] not rise to the level of an 'adverse action' because it is not action that would deter a 'similarly situated' individual from exercising his rights." (citing

*Simmons v. Adamy*, 987 F. Supp. 2d 302, 307 (W.D.N.Y. 2013)); *Snider v. Alvarez*, No. 18-CV-0801, 2020 WL 6395499, at *18 (M.D. Pa. Nov. 2, 2020) ("The remaining alleged adverse actions do not meet the level of adverse action defined by our Court of Appeals in *Dunbar* [*v. Barone*, 487 F. App'x 721, 723 (3d Cir. 2012)]: transfer from one side of the residential housing unit to the other, transfer to the Union County jail, and separation from inmate witnesses; theft of his legal book by John Doe One; damage to his typewriter; restricting time limits on telephone communication with counsel, including refusing to allow him to bring pre-approved legal materials to a pre-approved visit with counsel, turning counsel away from a visit, and causing a video and audio feed for a court appearance . . . ; impeding mail; and, turning off his cable-TV for two weeks.").

Accordingly, plaintiff's Second Retaliation Claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**b. Fourth, Fifth, Ninth, Fourteenth, and Fifteenth Retaliation Claims**

With respect to plaintiff's Fourth, Fifth, Ninth, Fourteenth, and Fifteenth Retaliation Claims, the complaint vaguely alleges that (1) Grievance Coordinator Wilcox made a false statement in an affidavit regarding plaintiff's grievance filing history to cover up the misconduct of others, (2) defendants Giddins and Baker encouraged other inmates to "target" plaintiff on unidentified dates, (3) defendant Corrow "encouraged" unidentified corrections officials in the messhall to harass plaintiff and call him a rat on December 21, 2025, (4) Nurse

Beltran harassed plaintiff by reciting the names of his family members aloud and accusing him of sexually assaulting his family, and (5) Nurse Uma, Nurse Beltran, Nurse Jane Doe, Corrections Officer Jane Doe, Corrections Officer Tamer, and Corrections Officer Moran harassed plaintiff regularly and encouraged other inmates to insult him. Each claim is supported entirely by conclusory allegations. For example, the Fourth Retaliation Claim is not supported by any details regarding (1) why Grievance Coordinator Wilcox prepared an affidavit, (2) how the affidavit was used against plaintiff, or (3) why plaintiff believes the affidavit was motivated by plaintiff's engagement in protected activity. Similarly, plaintiff does not explain, with respect to the Fifth, Ninth, and Fifteenth Retaliation Claims, (1) how inmates and other corrections officials were "encouraged" to "target" or insult plaintiff, (2) how plaintiff may have been harmed by the harassment that he experienced, or (3) why plaintiff believes this harassment was motivated by his engagement in protected activity. *See Keesh v. Quick*, No. 19-CV-8942, 2021 WL 639530, at *10 (S.D.N.Y. Feb. 17, 2021) ("To the extent Plaintiff claims that Capra's failure to timely decide the appeal was done in retaliation for Plaintiff being an IGRC Rep or filing grievances against prison officials, Plaintiff fails to allege a causal connection between the alleged adverse action and Plaintiff's protected conduct, alleging the ultimate fact of retaliation in a speculative and conclusory manner.").[7] Finally, with respect to the Fourteenth Retaliation Claim, it is unclear (1) how plaintiff is aware that

---

[7] In general, "[c]ourts have found that, while verbal threats may qualify as adverse actions" for purposes of a First Amendment retaliation claim, the threats "must be 'sufficiently specific and direct' to be actionable." *Tutora v. Gessner*, No. 17-CV-9517, 2019 WL 1382812, at *7 (S.D.N.Y. Mar. 27, 2019) (quoting *Terry v. Hulse*, No. 16-CV-252, 2018 WL 4682784, at *11 (S.D.N.Y. Sept. 28, 2018)).

any inmates heard Nurse Beltran making harassing statements about him, (2) how plaintiff may have been harmed by the harassment that he experienced, or (3) why plaintiff believes this harassment was motivated by his engagement in protected activity.

Thus, the Court has no basis to plausibly infer from the allegations in the complaint that any of the alleged wrongdoing related to harassing plaintiff or facilitating insults and threats against him was based on his engagement in protected activity. *See also Hayes v. Dahkle*, No. 9:16-CV-1368 (TJM/CFH), 2017 WL 384066, at *7 (N.D.N.Y. Jan. 27, 2017) (dismissing retaliation claim against corrections officer where plaintiff failed to allege that corrections officer was aware of the protected activity that gave rise to the claim); *Burroughs v. Petrone*, 138 F. Supp. 3d 182, 208 (N.D.N.Y. 2015) (same).

Accordingly, plaintiff's Fourth, Fifth, Ninth, Fourteenth, and Fifteenth Retaliation Claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**c. Eighth, Tenth, and Twelfth Retaliation Claims**

With respect to plaintiff's Eighth, Tenth, and Twelfth Retaliation Claims, the complaint alleges that defendant Corrections Officer Wilcox issued plaintiff a misbehavior report for not turning on the light in his cell, issued plaintiff a second misbehavior report for not having his light on during count, and issued plaintiff a third misbehavior report for sleeping on count. Plaintiff does not allege that he was innocent of the charges in the first or third misbehavior report. Moreover, although plaintiff alleges that he was wrongfully issued the second

misbehavior report, he does not identify what punishment he received, if any, in connection with this misbehavior report. Thus, the Court has no basis to plausibly infer that any of the misbehavior reports issued by Corrections Officer Wilcox satisfy the "adverse action" requirement. *See, e.g., Graham v. Henderson*, 89 F.3d 75, 81 (2d Cir. 1996) (prisoner's version of events would be insufficient as a matter of law where, even if allegations of retaliatory motivation were true, there were proper, non-retaliatory reasons for complained-of punishment); *Berry v. Tremblay*, No. 9:20-CV-177 (DNH/TWD), 2021 WL 1575951 at *4 (N.D.N.Y. April 22, 2021) ("Courts in this district have routinely found the mere filing of a misbehavior report alone, without evidence of other repercussions, does not constitute an adverse action."), *report and recommendation adopted by* 2021 WL 2580100 (N.D.N.Y. June 23, 2021) (collecting cases); *Gilmore v. Blair*, No. 9:18-CV-463, 2020 WL 5792467, at *6 (N.D.N.Y. June 30, 2020), *report and recommendation adopted by* 2020 WL 5775203 (N.D.N.Y. Sept. 28, 2020) (finding that a misbehavior report that resulted in the charges being dismissed did not constitute adverse action); *McFadden v. Friedman*, No. 9:12-CV-0685 (GTS/CFH), 2015 WL 5603433, at *16 (N.D.N.Y. Sept. 23, 2015) ("As plaintiff has pleaded guilty to the conduct contained in the misbehavior report, plaintiff has failed to set forth any evidence demonstrating that a false misbehavior report was issued, and, therefore, has failed to establish that he suffered an adverse action."); *Gantt v. Lape*, No. 9:10-CV-0083 (GTS/GHL), 2012 WL 4033729, at *8 (N.D.N.Y. July 31, 2012) ("The filing of misbehavior reports that result in a temporary loss of various privileges such as permission to visit the

commissary [does] not constitute adverse action because they are de minimis."); *Shaheen v. McIntyre*, No, 9:05-CV-0173 (TJM/GHL), 2007 WL 3274835, at *9 (N.D.N.Y. Nov. 5, 2007) ("allegations of lost privileges, standing alone, would be too de minimis to constitute 'adverse action' "); *Pledger v. Hudson*, No. 99-CV-2167, 2005 WL 736228, at *5 (S.D.N.Y. Mar. 31, 2005) (declining to find adverse action where plaintiff "admitted to the content of the [misbehavior ] report and plead guilty to one of the charges in it").

Accordingly, plaintiff's Eighth, Tenth, and Twelfth Retaliation Claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**2. Mail Tampering Claim**

"[A] prisoner's right to the free flow of incoming and outgoing mail is protected by the First Amendment." *Davis v. Goord*, 320 F.3d 346, 351 (2d Cir. 2003). A prisoner's mail may only be restricted to further "'one or more of the substantial governmental interests of security, order, and rehabilitation . . . [and] must be no greater than is necessary or essential to the protection of the particular governmental interest involved.'" *Id*. (quoting *Washington v. James*, 782 F.2d 1134, 1139 (2d Cir. 1986)).

As courts have attempted to balance the competing interests implicated when facilities place restrictions on prison mail, the courts have "consistently afforded greater protection to legal mail than to non-legal mail, as well as greater protection to outgoing mail than to incoming mail." *Davis*, 320 F.3d at 351. "[A]n isolated incident of mail tampering is usually

insufficient to establish a constitutional violation." *Davis*, 320 F.3d at 351 (citations omitted). However, in *Washington v. James*, the Second Circuit found that "as few as two incidents of mail tampering could constitute an actionable violation (1) if the incidents suggested an ongoing practice of censorship unjustified by a substantial government interest, or (2) if the tampering unjustifiably chilled the prisoner's right of access to the courts or impaired the legal representation received." *Davis*, 320 F.3d at 351 (citing *Washington*, 782 F.2d at 1139); *see also Turner v. Safley*, 482 U.S. 78, 84-91 (1987) (prison regulations impinging constitutional rights must be "reasonably related to legitimate penological interests").

In this case, plaintiff alleges that on or around February 22, 2026, defendant Corrections Officer Lancaster placed plaintiff’s outgoing legal mail in a box, and the mail was returned to plaintiff roughly two and a half months later. Compl. at 60.

As an initial matter, the complaint does not allege that plaintiff experienced any similar mail issues with respect to any other court filings or communications with his attorney. Moreover, as noted, a single isolated delay in the processing of outgoing mail is typically not enough to state a First Amendment claim. *See, e.g., Labossiere v. Downstate Corr. Facility*, No. 21-CV-10540, 2022 WL 356549, at *5 (S.D.N.Y. Feb. 7, 2022) (sua sponte dismissing mail tampering claim where pleading lacked allegations suggesting “regular and unjustifiable interference with [plaintiff's] mail”); *Chavis v. Chappius*, No. 06-CV-543S, 2015 WL 1472117, at *14 (W.D.N.Y. Mar. 31, 2015) (dismissing free-flow-of-mail claim based on allegation that corrections official “confiscated a piece of his outgoing mail addressed to the Inspector

General" because "[e]ven assuming plaintiff's letter to the Inspector General was legal mail, there are no factual allegations that DePasquale's action actually 'hindered [plaintiff's] efforts to pursue a legal claim' or otherwise prejudiced a legal action as required to state a claim for denial of access to the courts due to interference with legal mail ... [and] plaintiff does not allege that this defendant 'regularly and unjustifiably' interfered with his personal mail" (internal citations omitted)); *Banks v. Annucci*, 48 F. Supp. 3d 394, 410-11 (N.D.N.Y. 2014) ("A single instance of mail tampering that does not result in the plaintiff suffering any damage is generally insufficient to support a constitutional challenge." (citing *Morgan v. Montanye*, 516 F.2d 1367, 1371 (2d Cir. 1975))); *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 346 (N.D.N.Y. 2010) ("[C]ourts in the Second Circuit have never held an isolated incident of mail tampering to violate an inmate's First Amendment rights."); *Davis*, 320 F.3d at 351.

Furthermore, the complaint lacks allegations which plausibly suggest that defendant Lancaster intentionally interfered with plaintiff's ability to send outgoing mail in order to prevent him from satisfying a court deadline, and the law is well-settled that "[a]n inadvertent or negligent delay in processing [a] plaintiff's mail [does] not rise to the level of a constitutional violation." *Robinson v. New York State Dep't of Correction Servs.*, No. 08-CV-0911, 2009 WL 3246818, at *12 (N.D.N.Y. Sept. 30, 2009) (citing *Daniels v. Williams*, 474 U.S. 327, 332 (1986) (negligence not actionable under Section 1983)); *Cusamano v. Sobek*, 604 F. Supp. 2d 416, 498 (N.D.N.Y. 2009) ("Negligence is not actionable under the First Amendment ...."); *Chaney v. Koupash*, No. 04-CV-0136, 2008 WL 5423419, at *10 (N.D.N.Y.

Dec. 30, 2008) ("However, these allegations are, at best, negligence on the part of defendants in losing Chaney's legal documents after his transfer. This is not enough to establish a First Amendment violation."); *Holmes v. Grant*, No. 03-CV-3426, 2006 WL 851753, at *12 (S.D.N.Y. Mar. 31, 2006) ("Mere negligence resulting in the loss of legal papers . . . does not state an actionable claim [as] plaintiff must allege facts demonstrating that defendants deliberately and maliciously interfered with his access to the courts [under the First Amendment] . . . [such as allegations] that the defendants deliberately stole his legal papers.").

Accordingly, plaintiff's mail tampering claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**3. Unlawful Search Claim**

Although "[a] right of privacy in traditional Fourth Amendment terms is fundamentally incompatible with the close and continual surveillance of inmates and their cells[,]" *Hudson v. Palmer*, 468 U.S. 517, 527-28 (1984), inmates "retain a limited right to bodily privacy." *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016). "To state a cognizable privacy claim, an inmate must allege that (1) he 'exhibited an actual, subjective expectation of bodily privacy,' and (2) prison officials lacked 'sufficient justification to intrude on the inmate's [F]ourth [A]mendment rights.'" *Telesford v. Annucci*, 693 Fed. App'x 1, 2-3 (2d Cir. 2017) (quoting *Harris*, 818 F.3d at 57).

Courts assessing an inmate's claim that officers infringed his or her Fourth Amendment rights in connection with a strip search must assess whether (1) the inmate possessed "an actual, subjective expectation of bodily privacy," and (2) "the prison officials had sufficient justification to intrude on [the inmate's] Fourth Amendment rights." *Covino v. Patrissi*, 967 F.2d 73, 77-78 (2d Cir. 1992).

In each case, "[t]he test of reasonableness under the Fourth Amendment requires a balancing of the need for the particular search against the invasion of the personal rights that the search entails." *Bell v. Wolfish*, 441 U.S. 520, 559 (1979). Where an isolated search is challenged as unreasonable, "courts typically apply the standard set forth in [*Bell*]" in determining the reasonableness of the search and consider the following factors: "(1) the scope of the intrusion; (2) the manner in which it was conducted; (3) the justification for initiating it; and (4) the place in which it was conducted." *Harris*, 818 F.3d at 58-59 (quoting *Bell*, 441 U.S. at 559).

In this case, the complaint alleges that plaintiff was removed from his cell on or around June 12, 2026, after throwing fecal matter out of his cell, and was subsequently questioned by Nurse Jane Doe about whether he was suicidal or wanted to hurt anyone else. Compl. at 25, 33. The complaint further alleges that after plaintiff answered “no” to these questions, defendants Allen, Ortiz, Tamer, and Wilcox “started to insult” him, told him that he would be placed on suicide watch for the night, strip searched him, and then moved him to a suicide watch cell. *Id*. at 33.

As an initial matter, the complaint does not allege that the search occurred in a manner contrary to established prison policy. The complaint also does not include any details regarding the manner of the search, where it occurred, how long it lasted, or who was present during the search. Moreover, the Court has no basis to plausibly infer from the allegations in the complaint that the search was unjustified.

Simply put, the complaint is devoid of allegations which plausibly suggest either that (1) strip searching plaintiff was an “exaggerated” response to penological concerns, or (2) the strip search only occurred because of an individual officer's ad hoc decision.

Accordingly, plaintiff’s Fourth Amendment claim is dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**4. Excessive Force Claims**

The Eighth Amendment's prohibition against cruel and unusual punishment encompasses the use of excessive force against an inmate, who must prove two components: (1) subjectively, that the defendant acted wantonly and in bad faith, and (2) objectively, that the defendant's actions violated "contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d 252, 262-63 (2d Cir. 1999) (internal quotations omitted) (citing *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

"The Eighth Amendment [also] requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs.*, 84

F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Law enforcement officials, including prison officials, can be held liable under Section 1983 for failing to intervene in a situation where another official is violating an inmate's constitutional rights, including the use of excessive force, in their presence. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001); *see also Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (prison official's Eighth Amendment duty to take reasonable measures to guarantee the safety of inmates in their custody includes a duty to protect inmates from harm threatened by other officers).

Here, the complaint alleges that several different corrections officials "sprayed" plaintiff "with an unknown substance" on various occasions using "a nasal spray bottle," and that the "spray," which was a watered-down version of a chemical agent, caused his skin to burn temporarily. *See* Compl. at 8, 12, 21, 26.

The complaint does not include any details regarding (1) whether plaintiff ever witnessed any official discharging the spray, (2) whether plaintiff ever witnessed the nasal spray bottle in the hands of any official, (3) how a chemical agent contacted plaintiff's skin if discharged from a nasal spray bottle, or (4) the severity of the skin "burn" that plaintiff experienced. The absence of such details is particularly troubling because, with respect to some of the alleged incidents, the complaint does not indicate where officials were located when the spray entered plaintiff's cell, and with respect to other incidents, the complaint appears to allege that officials "sprayed" plaintiff from a different floor or while he was

sleeping. *See* Compl. at 12, 31, 46. With respect to these latter incidents, it is unclear how plaintiff would have known the identity of the official who discharged the chemical agent, or the nature of the vessel from which the chemical agent was discharged.

Simply put, plaintiff's allegations regarding these use-of-force incidents are entirely vague, seemingly fanciful, and insufficient for this Court to accept as true. *See, e.g., Crawford v. Lutheran Med. Ctr.*, No. 08-CV-3429, 2011 WL 887806, at *2 (E.D.N.Y. Mar. 14, 2011) ("Though courts are required to accept a plaintiff's non-conclusory factual allegations as true, courts may nevertheless determine that the 'fantastic [or] delusional' character of some factual allegations renders a plaintiffs claims to relief implausible."); *Thomas v. Morley*, No. 20-CV-07520, 2022 WL 394384, at *10 (S.D.N.Y. Feb. 9, 2022) ("As to the other excessive force theory—Toll's random use of a fire extinguisher—that claim is likewise dismissed, as the allegations are far too conclusory to state a claim."); *Roberts v. Blowers*, No. 21-CV-06187, 2021 WL 1579072, at *3 (W.D.N.Y. Apr. 22, 2021) ("It is the conclusory nature of [Plaintiff]'s allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." (quoting *Iqbal*, 556 U.S. at 681)); *Terry v. City of New York*, No. 19-CV-9688, 2021 WL 517935, at *4 (S.D.N.Y. Feb. 10, 2021) ("[A] sufficient claim might describe what happened, who was involved, whether any weapons or implements were used ... [the] injury, how severe it was it, how long it lasted, what if any treatment he received and for how long. Lacking specificity, the claim for excessive force is dismissed.").

Accordingly, plaintiff's Eighth Amendment excessive force claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**5. Failure-to-Protect Claims**

"The Eighth Amendment requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody." *Hayes v. New York City Dept. of Corrs.*, 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Prison officials may be held liable under Section 1983 for failing to protect an inmate from conditions posing a substantial risk of serious harm. *See Farmer*, 511 U.S. at 836. In order to establish a "failure to protect," the plaintiff must show that he was incarcerated under conditions posing a substantial risk of serious harm, and prison officials acted with deliberate indifference to that risk and the inmate's safety. *Id*. Deliberate indifference exists when "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837.

"One way to make out such a claim is to allege that 'a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant official being sued had been exposed to information concerning the risk and thus must have known about it.'" *Coronado v. Goord*, No. 99-CV-1674, 2000 WL 1372834, at *4 (S.D.N.Y. Sept. 25, 2000) (quoting *Farmer*, 511

U.S. at 842-43); *see also Hayes*, 84 F.3d at 620-21 (prisoner's repeated expressions of fear following an inmate attack and requests for transfer as a safety measure raised a question of fact). "Courts have [also] found that a prisoner validly states an Eighth Amendment claim based on a failure to protect when he alleges that he informed corrections officers about a specific fear of assault and is then assaulted." *Davis v. Torres*, No. 10-CV-2236, 2012 WL 3070092, at *5 (S.D.N.Y. May 2, 2012), *report and recommendation adopted by* 2012 WL 3070083 (S.D.N.Y. July 27, 2012); *see also Beckles v. Bennett*, No. 05-CV-2000, 2008 WL 821827, at *17 (S.D.N.Y. Mar. 26, 2008) (denying summary judgment where plaintiff presented evidence that he informed sergeant of correction officers' threatening behavior and was later assaulted by those officers).

At this stage of the proceeding, and mindful of the Second Circuit's direction that a pro se plaintiff's pleadings must be liberally construed, the Court finds that plaintiff's First Failure-to-Protect Claim, Second Failure-to-Protect Claim, Fourth Failure-to-Protect Claim, and Sixth Failure-to-Protect Claim survive sua sponte review and require a response. In so ruling, the Court expresses no opinion as to whether these claims can withstand a properly filed dispositive motion.

The Court, however, reaches a different conclusion with respect to plaintiff’s Third, Fifth, Seventh, and Eighth Failure-to-Protect Claims and finds that each of these claims is deficient for the same reasons. More specifically, with respect to each of these failure-to-protect claims, the complaint vaguely alleges that officials encouraged other inmates to insult

or fight plaintiff on various dates, without any details regarding (1) what these officials specifically stated to other inmates regarding plaintiff that may have encouraged harm against him, or (2) how plaintiff became aware of this alleged misconduct. In addition, with the exception of the Seventh Failure-to-Protect Claim, plaintiff does not allege that he was ever attacked or harmed by any inmates following the alleged statements, and, with respect to the Seventh Failure-to-Protect Claim, the complaint does not include any details regarding (1) whether plaintiff had a negative history with the inmate who allegedly stabbed him, (2) the events leading up to the alleged altercation, or (3) how, when and why plaintiff believes defendants Tamer and Corrections Officer Jane Doe "instructed" the assault through "insults" directed at plaintiff. Thus, the Court has no basis to plausibly infer, with respect to the Third, Fifth, Seventh, and Eighth Failure-to-Protect Claims, that any of the named defendants exposed plaintiff to a specific risk of serious harm through their alleged harassing behavior. *See, e.g., Dadaille v. Coxsackie Corr. Facility*, No. 9:23-CV-1583 (GTS/ML), 2024 WL 1257378, at *5 (N.D.N.Y. Mar. 25, 2024) ("Here, plaintiff alleges that King violated his Eighth Amendment rights because he attempted to incite unidentified inmates to assault plaintiff. . . . However, plaintiff's vague and ambiguous allegations fail to allege how and when King 'directed' unidentified inmates to attack plaintiff. Moreover, plaintiff does not allege that he was actually attacked as a result of King's alleged statements."); *Smith v. New York*, No. 23-CV-7613, 2023 WL 7133218, at *5 (S.D.N.Y. Oct. 27, 2023) ("Here, Plaintiff's allegations that correction officers made remarks concerning his sexual orientation that caused him

'humiliation in population' may be an attempt to assert a claim that correction officials were deliberately indifferent to his safety. Plaintiff does not, however, allege any facts suggesting that he suffered physical injury or was threatened with imminent physical injury as a result of the correction officers' comments."); *Nji v. Heath*, No. 13-CV-0200, 2013 WL 6250298, *10 (S.D.N.Y. Dec. 2, 2013) (plaintiff failed to state an Eighth Amendment claim based upon defendant's rumor where "[p]laintiff [did] not allege that he was ever actually threatened with harm as a result, or that he or other inmates had been harmed as a result of this rumor"); *Bouknight v. Shaw*, No. 08-CV-5187, 2009 WL 969932, at *4 (S.D.N.Y. Apr. 6, 2009) ("[A] prisoner can state a claim under the Eighth Amendment against a corrections officer who spreads malicious rumors about him if the rumors incited other inmates to assault [the plaintiff], thereby placing him at grave risk of physical harm. . . . However, if the plaintiff fails to allege—with concrete facts, not conclusory assertions—that he has suffered an objectively 'sufficiently serious' injury or that the corrections officer acted with a 'sufficiently culpable state of mind,' then the claim must be dismissed." (internal quotation marks and citations omitted)).

Accordingly, plaintiff's Third, Fifth, Seventh, and Eighth Failure-to-Protect are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**6. Conditions-of-Confinement Claims**

To demonstrate that the conditions of confinement constitute cruel and unusual

punishment in violation of the Eighth Amendment, a plaintiff must satisfy both an objective and subjective element. *See Jolly v. Coughlin*, 76 F.3d 468, 480 (2d Cir. 1996). A plaintiff must demonstrate that (1) the conditions of confinement resulted in "unquestioned and serious deprivations of basic human needs," *Anderson v. Coughlin*, 757 F.2d 33, 35 (2d Cir. 1985); *see also Jolly*, 76 F.3d at 480, and (2) the defendants acted with "deliberate indifference." *Wilson*, 501 U.S. at 303-04. In analyzing whether exposure to cold temperatures may satisfy the objective element of an Eighth Amendment claim, courts consider both the severity and duration of the exposure, neither of which can be evaluated by this Court based on the current allegations. *See, e.g., Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (*prolonged* exposure to cold can constitute an Eighth Amendment violation (emphasis added)); *Corselli v. Coughlin*, 842 F.2d 23, 27 (2d Cir. 1988) (prisoner's claim that he had been deliberately exposed to bitter cold in his cell for three months may assert Eighth Amendment violation); *Wright v. McMann*, 387 F.2d 519 (2d Cir. 1967) (allegations that prisoner was denuded and exposed to bitter cold in solitary confinement cell for eleven days, that he was deprived of basic elements of hygiene such as soap and toilet paper, and that cell was filthy, without adequate heat, and virtually barren would, if established, constitute cruel and unusual punishment in violation of the Eighth Amendment).

In this case, the complaint alleges that defendants Charly and Corrections Officer Wilcox denied plaintiff access to breakfast meals on December 6, December 20, and December 21, 2025, and defendants Allen, Ortiz, Tamer, Corrections Officer Wilcox, and

Nurse Jane Doe placed plaintiff in an unsanitary, illuminated suicide watch cell for two days.

Although a substantial deprivation of food constitutes an Eighth Amendment violation, the sporadic denial of a few meals, as in this case, is insufficient to state an Eighth Amendment violation. *See Sankara v. Montgomery*, 9:16-CV-00885 (FJS/TWD), 2018 WL 4610686, at *9 (N.D.N.Y. June 25, 2018) (collecting cases holding that the sporadic denial of a few meals is insufficient to state an Eighth Amendment violation); *Brown v. Womack*, No. 16-CV-0031, 2019 WL 4689166, at *4 (W.D.N.Y. Sept. 26, 2019) ("A denial of only a few meals does not rise to th[e] level [of a sufficiently serious condition].").

Similarly, while exposure to continuous light and unsanitary conditions may, under certain circumstances, rise to the level of an Eighth Amendment violation, in this case, plaintiff's light exposure was limited to two days and the complaint is devoid of allegations regarding the intensity of the light. Moreover, the only identified unsanitary condition within the cell during this time was a "dirty mattress that had blood stains[.]" Compl. at 26, 34. The Court has no basis to plausibly infer that these conditions were of sufficient severity and duration to satisfy the objective element of an Eighth Amendment claim. *Jones v. Rock*, No. 9:12-CV-0447 (NAM/TWD), 2013 WL 4804500, *10 (N.D.N.Y. Sept. 6, 2013) ("Requiring inmates to live in constant illumination can ..., under certain circumstances, rise to the level of an Eighth Amendment violation."); *Quick v. Graham*, No. 9:12-CV-1717 (DNH/ATB), 2016 WL 873853, at *5 (N.D.N.Y. Jan. 8, 2016) ("The decisions evaluating Eighth Amendment claims based on continuous lighting in the prison setting are very 'fact-driven,' generally turning on

the degree of illumination, the duration of the inmate's exposure, the extent of harm it causes, and the penological justification for the lighting." (quoting *Booker v. Maly*, No. 9:12-CV-246 (NAM/ATB), 2014 WL 1289579, at * 18-19 (N.D.N.Y. Mar. 31, 2014), aff'd, 590 F. App'x 82 (2d Cir. 2015))), *report and recommendation adopted by* 2016 WL 879310 (N.D.N.Y. Mar. 7, 2016), *vacated* (Mar. 7, 2016), and *report and recommendation adopted by* 2016 WL 1261107 (N.D.N.Y. Mar. 30, 2016); *Diaz v. Fischer*, No. 08-CV-1208, 2010 WL 1132772, at *6 (N.D.N.Y. Feb. 23, 2010) (finding that the plaintiff's allegations that, while in disciplinary confinement, "he had a stained mattress, dirty walls and sink, ... lacked a desk and foot locker ... [and] was not offered a shower for two days are ... insufficient to state an Eighth Amendment violation"), *report and recommendation adopted in pertinent part by* 2010 WL 1133074 (N.D.N.Y. Mar. 23, 2010); *McNatt v. Unit Manager Parker*, No. 99-CV-1397, 2000 WL 307000, at *4 (D. Conn. January 18, 2000) (totality of conditions in restrictive housing unit, including stained, smelly mattresses; unclean cell; no bedding for six days; no cleaning supplies for six days; no toilet paper for one day; no toiletries or clothing for six days; no shower shoes; dirty showers; cold water that did not function properly; and smaller food portions, while not pleasant, did not rise to level of Eighth Amendment violation).

Furthermore, plaintiff does not allege that (1) the suicide watch cell where he was housed was the only suicide watch cell with constant illumination, (2) he complained to defendants Allen, Ortiz, Tamer, Corrections Officer Wilcox, and Nurse Jane Doe at any point regarding his cell conditions, or (3) these officials otherwise should have known about any

risk presented to plaintiff as a result of the aforementioned conditions. Thus, the Court also has no basis to plausibly infer that defendants Allen, Ortiz, Tamer, Corrections Officer Wilcox, and Nurse Jane Doe knowingly exposed plaintiff to an objectively serious risk of harm out of deliberate indifference to his well-being.

Accordingly, plaintiff's conditions-of-confinement claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**7. Disciplinary Due Process Claims**

To successfully state a claim under Section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)). Due process generally requires that the state afford individuals "some kind of hearing" prior to depriving them of a liberty or property interest. *DiBlasio v. Novello*, 344 F.3d 292, 302 (2d Cir. 2003).

An inmate's protected liberty interest is implicated where the punishment at issue imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor*, 515 U.S. 472, 484 (1995). The duration of the challenged confinement, while not determinative, is a significant factor under *Sandin*.

Although the Second Circuit has declined to provide a bright-line rule as to what duration of punitive confinement implicates a prisoner's constitutional rights, general guidelines have been defined. *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004). The Second Circuit generally takes the position that normal confinement in a segregated housing unit of 101 days or less does not constitute an "atypical and significant hardship" under Sandin. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000) (citing *Sealey v. Giltner*, 197 F.3d 578, 589-90 (2d Cir. 1999)). As a general matter, "[a] period of confinement between 101 and 305 days is considered to be an 'intermediate duration' and could implicate a liberty interest should a detailed record of the conditions of confinement indicate that it was an atypical and significant hardship." *Bunting v. Nagy*, 452 F. Supp. 2d 447, 456 (S.D.N.Y. 2006) (citing *Sealey*, 197 F.3d at 589); *see also Palmer*, 364 F.3d at 64-65 ("Where the plaintiff was confined for an intermediate duration -- between 101 and 305 days -- 'development of a detailed record' of the conditions of confinement relative to ordinary prison conditions is required." (citing *Colon*, 215 F.3d at 232)).

The due process protections afforded inmates facing disciplinary hearings that affect a liberty or property interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing, inter alia, *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974)). The hearing officer's

findings must be supported by "some" "reliable evidence." *Id*. (citing, *inter alia*, *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)).

With respect to plaintiff's First Disciplinary Due Process Claim, Second Disciplinary Due Process Claim, and Third Disciplinary Due Process Claim, the complaint does not clearly indicate what punishment, if any, plaintiff received. In addition, with respect to plaintiff's Fourth and Fifth Disciplinary Due Process Claims, the complaint does not allege that the disciplinary charges against plaintiff were false. Moreover, the sanctions that plaintiff received in connection with those disciplinary hearings – loss of a tablet and commissary privileges for an unidentified period of time and loss of package and commissary privileges for 60 days – do not trigger a liberty interest. *Bradshaw v. Marshal*, No. 9:21-CV-0826 (MAD/CFH), 2021 WL 11745345, at *8 n.12 (N.D.N.Y. Sept. 14, 2021) ("[T]he deprivation of tablet privileges for roughly three weeks does not implicate the loss of a liberty interest." (collecting cases)); *Smart v. Goord*, 441 F. Supp. 2d 631, 640 (S.D.N.Y. 2006) ("[T]he loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest under New York law."); *Johnson v. Enu*, No. 08-CV-0158 (FJS/DRH), 2011 WL 3439179, at *12 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges did not give rise to a protected liberty interest).[8]

---

[8] Without the denial of a cognizable liberty interest, there can be no due process violation. *See Scott v. Albury*, 156 F.3d 283, 287 (2d Cir. 1998) ("No right to due process is implicated in the prison context unless a liberty interest has been deprived, and we read *Sandin* to require that we look to actual punishment in making this determination."); *Gill v. Riddick*, No. 9:03-CV-1456 (NAM/RFT), 2005 WL 755745, at *15 (N.D.N.Y. Mar. 31, 2005) ("[W]here no liberty interests are at stake, . . . the Court need not assess the adequacy of the process . . . received.").

Accordingly, plaintiff's Fourteenth Amendment disciplinary due process claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**8. Due Process Claim Based on Missing Property**

The Supreme Court has held that even the unauthorized intentional destruction of a prisoner's property may not be the basis for constitutional claims if sufficient post deprivation remedies are available to address the claim. *Hudson*, 468 U.S. at 531 (citing *Parratt v. Taylor*, 451 U.S. 527, 541 (1981)); *see also Rivera-Powell v. New York City Board of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) ("When the state conduct in question is random and unauthorized, the state satisfies procedural due process requirements so long as it provides meaningful post deprivation remedy."). "New York in fact affords an adequate post-deprivation remedy in the form of, inter alia, a Court of Claims action." *Jackson v. Burke*, 256 F.3d 93, 96 (2d Cir. 2001); *Davis v. New York*, 311 Fed. App'x 397, 400 (2d Cir. 2009) ("The existence of this adequate post-deprivation state remedy would thus preclude [plaintiff's] due process claim under § 1983 [for lost personal property]."). Moreover, the complaint is devoid of any allegations which plausibly suggest that adequate post-deprivation remedies to pursue expenses associated with the lost or destroyed property are unavailable to plaintiff.

Accordingly, plaintiff's Fourteenth Amendment due process claim based on the loss or destruction of personal property is dismissed without prejudice pursuant to 28 U.S.C. §

1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**9. Denial of Grievance Claim**

The law is well-settled that a prison inmate has no constitutional right of access to an internal grievance process, or an investigation into alleged wrongdoing. *Rhodes v. Hoy*, No. 9:05-CV-0836 (FJS/DEP), 2007 WL 1343649, at *6 (N.D.N.Y. May 5, 2007) (noting that inmates have "no constitutional right of access to the established inmate grievance program"); *Davis v. Buffardi*, No. 9:01-CV-0285 (PAM/GJD), 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) ("[P]articipation in an inmate grievance process is not a constitutionally protected right."); *Cancel v. Goord*, No. 00-CV-2042, 2001 WL 303713, at *3 (S.D.N.Y. Mar. 29, 2001) (holding that "inmate grievance procedures are not required by the Constitution" and therefore failure to see to it that grievances are properly processed does not create a claim under Section 1983); *Johnson v. McKay*, No. 9:14-CV-0803 (BKS/TWD), 2015 WL 1735102, at *6 (N.D.N.Y. Apr. 16, 2015) ("[E]ven assuming that defendants denied plaintiff evidence for or access to inmate grievance procedures at Upstate Correctional Facility, such facts simply do not implicate the First Amendment or give rise to a constitutional claim."); *DeShaney v. Winnebego Soc. Servs.*, 489 U.S. 189, 196 (1989) (The Due Process Clause "generally confers no affirmative right to governmental aid, even where that aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."); *Pine v. Seally*, No. 9:09-CV-1198 (DNH/ATB), 2011 WL 856426,

at *9 (N.D.N.Y. Feb. 4, 2011) ("To the extent that plaintiffs attempt to assert a separate constitutional claim of 'failure to investigate,' the law is . . . clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials.") (citing *Bernstein v. New York*, 591 F. Supp. 2d 448, 460 (S.D.N.Y. 2008) (collecting cases)); *Torres v. Mazzurca*, 246 F. Supp. 2d 334, 341-42 (S.D.N.Y. 2003) (Inmates do not have a due process right to a thorough investigation of grievances).

Accordingly, plaintiff's Section 1983 claims against Grievance Coordinator Wilcox based on this official's failure to file or address his grievances are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**10. Equal Protection Claims**

The Equal Protection Clause requires that the government treat all similarly situated people alike. *City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). Specifically, the Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)). To state a viable claim for denial of equal protection, a

plaintiff generally must allege "purposeful discrimination . . . directed at an identifiable or suspect class." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995).

In the alternative, under a "class of one" theory, a plaintiff must allege that he has been intentionally treated differently from others similarly situated, with no rational basis for the difference in treatment. *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000); *DeMuria v. Hawkes*, 328 F.3d 704, 706 (2d Cir. 2003). However, "class-of-one plaintiffs must show an extremely high degree of similarity between themselves and the persons to whom they compare themselves." *Clubside, Inc. v. Valentin*, 468 F.3d 144, 159 (2d Cir. 2006). "Accordingly, to succeed on a class-of-one claim, a plaintiff must establish that (i) no rational person could regard the circumstances of the plaintiff to differ from those of a comparator to a degree that would justify the differential treatment on the basis of a legitimate government policy; and (ii) the similarity in circumstances and difference in treatment are sufficient to exclude the possibility that the defendants acted on the basis of a mistake." *Id*. (internal quotation marks omitted); *see also Engquist v. Or. Dep't of Agric*., 553 U.S. 591, 601 (2008) (explaining that "[t]here are some forms of state action, . . . which by their nature involve discretionary decisionmaking based on a vast array of subjective, individualized assessments" and "[i]n such cases the rule that people should be 'treated alike, under like circumstances and conditions' is not violated when one person is treated differently from others, because treating like individuals differently is an accepted consequence of the discretion granted").

In this case, the complaint asserts equal protection claims against defendants Moran and Corrections Officer Wilcox based on these officials issuing plaintiff misbehavior reports for engaging in the same conduct as other inmates who were not also issued misbehavior reports.

As an initial matter, the complaint lacks allegations which plausibly suggest that plaintiff is a member of a protected class, and otherwise fails to explain how plaintiff believes the disciplinary charges may have been the result of any sort of discrimination. In addition, insofar as plaintiff may have intended to assert an equal protection claim under a class-of-one theory, the complaint only generically alleges that plaintiff was treated less favorably than other inmates. Indeed, plaintiff does not identify any inmates who were treated differently than him under similar circumstances.

Furthermore, as the Supreme Court noted in *Engquist*, because the alleged wrongdoing involves "discretionary decisionmaking based on a vast array of subjective, individualized assessments[,]" allowing plaintiff's "challenge based on the arbitrary singling out ... would undermine the very discretion that ... state officials are entrusted to exercise" under the circumstances. 553 U.S. at 603-04 (explaining that a "class of one" claim cannot exist in a situation involving "a traffic officer" who, for non-discriminatory reasons, issues a speeding ticket to one person driving above the speed limit and not others because "allowing an equal protection claim on the ground that a ticket was given to one person and not others, even if for no discernible or articulable reason, would be incompatible with the discretion

inherent in the challenged action"); *see also Nali v. Ekman*, 355 Fed. App'x 909, 912-13 (6th Cir. 2009) (dismissing equal protection claim based on allegations that "caucasian" officials " 'conspir[ed]' to issue" the plaintiff, a "non-caucasian" individual, "two major misconduct infractions" for "being in the chow hall at the wrong time" even though "'no one else was ticketed' for similar conduct" because there were no allegations in the complaint "that the people not disciplined were similarly situated and of a different race").

Accordingly, plaintiff's equal protection claims are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**11. ADA Claims**

Title II of the ADA "proscribes discrimination against the disabled in access to public services." *Harris v. Mills*, 572 F.3d 66, 73 (2d Cir. 2009) (citation omitted). The statute provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id.* (citing 42 U.S.C. § 12132).

"In order to establish a prima facie violation under [the ADA], [an inmate] must show that 1) he is a qualified individual with a disability; 2) [the agency] is an entity subject to the acts; and 3) he was denied the opportunity to participate in or benefit from [the agency's] services, programs, or activities or . . . otherwise discriminated against . . . by reason of his

disability." *Wright v. New York State Dep't of Corr.*, 831 F.3d 64, 72 (2d Cir. 2016) (citing *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). "For purposes of determining whether an ADA plaintiff is a 'qualified individual with a disability,' . . . the ADA defines 'disability' to include, inter alia, 'a physical or mental impairment that substantially limits one or more major life activities[.]'" *Hamilton v. Westchester Cty.*, 3 F.4th 86, 92 (2d Cir. 2021) (quoting *Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020) (quoting 42 U.S.C. § 12102(1)(A))).

Title II of the ADA does not "provide[ ] for individual capacity suits against state officials." *Garcia v. S.U.N.Y. Health Scis. Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001); *Keitt v. New York City*, 882 F. Supp. 2d 412, 426 (S.D.N.Y. 2011) ("Individuals in their personal capacities are not proper defendants on claims brought under the ADA . . . ." (citing *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009))). Accordingly, plaintiff's ADA claims asserted against the named defendants in their individual capacities are dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

Insofar as the complaint may be construed to assert official capacity claims against the named defendants, the Second Circuit has made clear that "an ADA claim for damages against a state (or state agency or official) is not barred by the Eleventh Amendment 'if the plaintiff can establish that the Title II violation was motivated by either discriminatory animus or ill will due to disability.'" *Holly v. Cunningham*, No. 15-CV-0284, 2016 WL 8711593, at *5 (S.D.N.Y. June 17, 2016) (quoting *Garcia*, 280 F.3d at 112; *accord Johnson v. Goord*, No.

01-CV-9587, 2004 WL 2199500, at *19 (S.D.N.Y. Sept. 29, 2004) (dismissing official capacity claims under Title II of the ADA because the law does "not provide for money damages against the state or state officials in their official capacities, absent a showing that any violation was motivated by discriminatory animus or ill will due to the disability")).

Here, the complaint fails to identify any DOCCS service, program, or activity that plaintiff was unable to participate in because of his mental health condition, or a failure to accommodate it. Moreover, insofar as plaintiff believes that he was deprived of proper mental health treatment during his confinement at Clinton Correctional Facility, his claims are more appropriately analyzed under the Eighth Amendment. *See, e.g., Doe v. Pfrommer*, 148 F.3d 73, 82 (2d Cir. 1998) (dismissing ADA claim where it was "clear that the plaintiff [wa]s in essence challenging the adequacy of his [Vocational Educational Services for Individuals with Disabilities] services, not illegal disability discrimination"); *Bryant v. Madigan*, 84 F.3d 246, 249 (7th Cir. 1996) ("[The ADA is] not ... violated by a prison's simply failing to attend to the medical needs of its disabled prisoners. . . . [Plaintiff's] complaint is that he was not given special accommodation. . . . [H]e is not complaining of being excluded from some prison service, program, or activity, for example an exercise program that his paraplegia would prevent him from taking part in without some modification of the program. He is complaining about incompetent treatment of his paraplegia. The ADA does not create a remedy for medical malpractice."); *Atkins v. County of Orange*, 251 F. Supp. 2d 1225, 1232 (S.D.N.Y. 2003) (dismissing disabled plaintiff's ADA claim that alleged that he received an

“inappropriate medical regime [that] caused him to sleep all the time, miss recreation and meal opportunities and otherwise deprive[d] him of any significant activity of any kind while he was at the jail,” because the claim was “in essence challenging the adequacy of the mental health services provided at the Jail, not illegal disability discrimination” (internal quotation marks omitted)); *Elbert v. New York State Dep't of Corr. Servs.*, 751 F. Supp. 2d 590, 595 (S.D.N.Y. 2010) (“[T]he bare allegation of inadequate medical care, even when made by a person with a serious disability, does not state a claim under the ADA. Put another way, Plaintiff is claiming that Decedent was not properly treated for his transverse myelitis, not that he was mistreated because of his transverse myelitis. Accordingly, Plaintiff's ADA claim is dismissed.”); *Hall v. N.Y. State Dep't of Corr. & Cmty. Supervision*, No. 12-CV-0377, 2015 WL 901010, at *3-6 (N.D.N.Y. Mar. 3, 2015) (dismissing ADA and Rehabilitation Act claims alleging disparate treatment and failure to reasonably accommodate the plaintiff's mental illness, where the plaintiff's denial of access to programs and services was based largely on his conviction of disciplinary offenses, the complaint failed to allege that "non-mentally-ill inmates convicted of a disciplinary offense and serving a sentence in SHU" received access to those programs, and the complaint largely complained of the adequacy of his mental health treatment rather than discrimination); *Roberts v. City of New York*, No. 14-CV-5198, 2016 WL 4146135, at *9 (S.D.N.Y. Aug. 2, 2016) (dismissing ADA and Rehabilitation Act claims where the plaintiff failed to allege that he "was excluded from participation in any program or activity, or otherwise treated differently, because of" his diabetes, and his claims

sounded in medical malpractice rather than disability discrimination); *see also Nails v. Laplante*, 596 F. Supp. 2d 475, 481-82 (D. Conn. 2009) (dismissing inmate's ADA claim, which focused on inadequate medical care, because the complaint “d[id] not include any non-conclusory allegations of discriminatory animus or ill will based on his disability and identifie[d] no program he could not participate in or any service that was denied as a result of his disability”); *Carrion v. Wilkinson*, 309 F. Supp. 2d 1007, 1016 (N.D. Ohio 2004) (“[Plaintiff] failed to allege that the defendants denied him the benefits of any services, programs, or activities provided for other non-disabled inmates, or that [the defendants] subjected him to discrimination because of his diabetes. Instead, he claims that he was denied a diabetic diet . . . [but this] is not the type of claim that the ADA . . . [was] intended to cover.” (internal quotation marks and brackets omitted)).

Accordingly, plaintiff's ADA claims asserted against the named defendants in their official capacities are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

**12. Supervisory Liability Claims**

Insofar as plaintiff asserts Section 1983 claims against Grievance Coordinator Wilcox and Superintendent King based on allegations that these officials failed to investigate and address various incidents of alleged wrongdoing, sending a supervisory official a letter that raises concerns about prison treatment is generally not, without more, a basis for finding that official to have been personally involved in the alleged wrongdoing. *See, e.g., Tripathy v.*

*Schneider*, No. 21-CV-6392, 2021 WL 4504461, at *3 (W.D.N.Y. Oct. 1, 2021) (dismissing Section 1983 claim against Commissioner of New York State Department of Corrections and Community Supervision and Governor of New York where complaint alleged only that these officials "failed to respond" to plaintiff's complaints of wrongdoing, noting that "the failure to respond to letters protesting unconstitutional actions and/or requesting an investigation is, without more, insufficient to establish personal involvement"); *Brown v. Montone*, No. 17-CV-4618, 2018 WL 2976023, at *4 (S.D.N.Y. June 13, 2018) ("It is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations." (quoting *Allah v. Annucci*, No. 16-CV-1841, 2017 WL 3972517, at *7 (S.D.N.Y. Sept. 7, 2017)); *Tangreti*, 983 F.3d at 616 (holding that a plaintiff asserting an Eighth Amendment claim against a supervisory official must allege that the supervisor had "subjective knowledge of a substantial risk of serious harm to an inmate and disregarded it" (quoting *Farmer*, 511 U.S. at 837)).

Moreover, in this case, the complaint is devoid of allegations which plausibly suggest that plaintiff's complaints related to any clear ongoing harm, and the law is well-settled that the failure to remedy harm that is not ongoing cannot give rise to a cognizable Section 1983 claim. *See, e.g.*, *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation."); *cf. Burton v. Lynch*,

664 F. Supp. 2d 349, 362 (S.D.N.Y. 2009) ("A superintendent cannot 'remedy' a violation of constitutional rights which has already ceased by ordering some change in prison conditions.").

Furthermore, "[a]fter *Tangreti*, a failure to train claim cannot be premised simply on the existence of inadequate training or policies established under the supervision of an individual defendant." *Est. of King by & through King v. Annucci*, 693 F. Supp. 3d 310, 326 (N.D.N.Y. 2023); *Myers on behalf of Est. of Myers v. Davenport*, No. 21-CV-0922 (LEK/CFH), 2022 WL 3017367, at *4 (N.D.N.Y. July 29, 2022) ("Liability based solely [...] due to a failure to supervise, without more, constitutes precisely the type of vicarious, respondeat superior liability that *Iqbal* and *Tangreti* eliminate." (citation omitted)). "Instead, a plaintiff must point to 'facts showing that each supervisor was aware that his or her actions would cause a substantial risk of harm and then disregarded that risk.'" *Est. of King by & through King*, 693 F. Supp. 3d at 326 (quoting *Crispin v. Peiri*, No. 21-CV-475, 2023 WL 2931846 at *8 (D. Conn. April 13, 2023)); *O'Brien v. City of Syracuse*, No. 22-CV-948 (MAD/TWD), 2023 WL 6066036, at *19 (N.D.N.Y. Sept. 18, 2023) (dismissing claim against supervisor for failure to train and manage staff as "reminiscent of a 'supervisor liability' theory of liability for Section 1983 claims that is no longer available" after *Tangreti*), *reconsideration denied*, 2024 WL 4252052 (N.D.N.Y. Sept. 20, 2024).

In this case, the complaint does not allege any facts which plausibly suggest that any of the deprivations allegedly experienced by plaintiff (1) were foreseeable by either of the

supervisory officials, and (2) could have been prevented by additional or different training or supervision.

In light of the foregoing, plaintiff's supervisory liability claims against Grievance Coordinator Wilcox and Superintendent King are dismissed without prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

## IV. MOTION FOR INJUNCTIVE RELIEF

Preliminary injunctive relief "'is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). "In general, district courts may grant a preliminary injunction where a plaintiff demonstrates 'irreparable harm' and meets one of two related standards: 'either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party.'" *Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*, 769 F.3d 105, 110 (2d Cir. 2014) (quoting *Lynch v. City of N.Y.*, 589 F.3d 94, 98 (2d Cir. 2009) (internal quotation marks omitted)). However, when the moving party seeks a "mandatory injunction that alters the status quo by commanding a positive act," the burden is even higher. *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 406 (2d Cir. 2011) (citing *Citigroup Global Mkts., Inc. v. VCG Special*

*Opportunities Master Fund Ltd.*, 598 F.3d 30, 35 n.4 (2d Cir. 2010) (internal quotation marks omitted)). A mandatory preliminary injunction "should issue only upon a clear showing that the moving party is entitled to the relief requested, or where extreme or very serious damage will result from a denial of preliminary relief." *Cacchillo*, 638 F.3d at 406 (citing *Citigroup Global Mkts*., 598 F.3d at 35 n.4) (internal quotation marks omitted)); *see also Tom Doherty Assocs., Inc*. *v. Saban Entertainment, Inc.*, 60 F.3d 27, 33-34 (2d Cir. 1995) (a plaintiff seeking a mandatory injunction must make a "clear" or "substantial" showing of a likelihood of success on the merits of his claim).

The same standards used to review a request for a preliminary injunction govern consideration of an application for a temporary restraining order. *Local 1814, Int'l Longshoremen's Ass'n, AFL-CIO v. New York Shipping Ass'n, Inc.*, 965 F.2d 1224, 1228 (2d Cir. 1992); *Perri v. Bloomberg*, No. 06-CV-0403, 2008 WL 2944642, at * 2 (E.D.N.Y. Jul. 31, 2008). The district court has wide discretion in determining whether to grant preliminary injunctive relief. *Moore v. Consol. Edison Co. of New York, Inc*., 409 F.3d 506, 511 (2d Cir. 2005). "In the prison context, a request for injunctive relief must always be viewed with great caution so as not to immerse the federal judiciary in the management of state prisons." *Fisher v. Goord*, 981 F. Supp. 140, 167 (W.D.N.Y. 1997) (citing *Farmer v. Brennan*, 511 U.S. 825, 846-47 (1994)) (other citations omitted).

"'A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction.'" *Bisnews AFE (Thailand) Ltd. v. Aspen Research Group*

*Ltd*., 437 Fed. App'x 57, 58 (2d Cir. 2011) (summary order) (quoting *Faiveley Transport Malmo AB v. Wabtec Corp*., 559 F.3d 110, 118 (2d Cir. 2009)). Generally, an alleged violation of a constitutional right creates a presumption of irreparable harm. *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996). However, speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons*, 461 U.S. 95, 111-12 (1983); *see also Garcia v. Arevalo*, No. 93-CV-8147, 1994 WL 383238, at *2 (S.D.N.Y. June 27, 1994) ("It is well settled that an allegation of the mere possibility of irreparable harm is insufficient to justify the drastic remedy of preliminary injunction. . . . A party who seeks the extraordinary remedy of a preliminary injunction must show the alleged irreparable harm to be imminent, not remote or speculative, and the alleged injury to constitute one that is incapable of being fully remedied by monetary damages." (citations omitted)).

Plaintiff's motion seeks affirmative injunctive relief directing officials to stop "singleing [sic] [plaintiff] out for mental abuse [and] physical assaults[,] spraying [plaintiff] with O.C. spray mix[ed] with water, sending inmates to harass [him] in retaliation for protected speech . . . and writeing [sic] false misbehavior reports." *See* Motion for Injunctive Relief at 1.

Upon review, plaintiff's motion is deficient for several reasons. First, plaintiff has failed to offer any credible admissible evidence in support of his claims of wrongdoing. Instead, his motion is supported entirely by a rambling, self-serving, "affidavit." *See, e.g., Hancock v. Essential Resources, Inc*., 792 F. Supp. 924, 928 (S.D.N.Y. 1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."); *Ivy Mar Co. v. C.R. Seasons Ltd.*, 907 F. Supp.

547, 561 (E.D.N.Y. 1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Fox v. Anthony*, No. 6:10-CV-839 (GTS/ATB), 2010 WL 3338549, at *2 (N.D.N.Y. July 15, 2010) ("Plaintiff has submitted no evidence, other than his own speculation that defendants ... will retaliate against him when they find out that he filed this law suit. The same claim could be made by any inmate who names corrections officers as defendants in any action."), *report and recommendation adopted by* 2010 WL 3338558 (N.D.N.Y. Aug. 23, 2010); *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *8 (N.D.N.Y. Feb. 28, 2012) ("Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief.").

Second, plaintiff's request for injunctive relief is based in part on vague allegations of wrongdoing that bear no relationship to the underlying claims that remain in this action. For example, the motion seeks injunctive relief related to officials spraying plaintiff with a chemical agent. However, as set forth above, plaintiff's Eighth Amendment excessive force claims related to this misconduct were not adequately pled. *See Candelaria v. Baker,* No. 00-CV-0912, 2006 WL 618576, at *3 (W.D.N.Y. Mar. 10, 2006) ("To prevail on a motion for preliminary injunctive relief, the moving party must establish a relationship between the injury claimed in the motion and the conduct giving rise to the complaint." (internal quotation marks and citations omitted)); *see also Scarborough v. Evans*, No. 9:09-CV-0850 (NAM/DEP), 2010 WL 1608950, at *2 (N.D.N.Y. Apr. 20, 2010) (motion for preliminary injunction alleging use of excessive force and denial of medical care by non-parties denied where complaint alleged

denial of mental health care and proper conditions of confinement); *Lewis v. Johnston*, No. 9:08-CV-0482 (TJM/ATB), 2010 WL 1268024, at *3 (N.D.N.Y. Apr. 1, 2010) (denying motion for injunctive relief based upon actions taken by staff at Great Meadow Correctional Facility in 2010, where the complaint alleged wrongdoing that occurred at Franklin and Upstate Correctional Facilities in 2006 and 2007); *Mitchell v. New York State Dep't of Corr. Servs*., No. 06-CV-6278, 2011 WL 5326054, at *3 (W.D.N.Y. Nov. 3, 2011) (denying plaintiff's request for preliminary injunctive relief because "the facts underlying the request for injunctive relief [were] essentially unrelated to the underlying facts of the claims in this action, except for the fact that they arise in the prison context"); *McClenton v. Menifee*, No. 05-CV-2844, 2006 WL 2474872, at *17 (S.D.N.Y. Aug. 22, 2006) (denying motion for preliminary injunction where the underlying claim "[was] not included in the complaint and there [was] no showing that the plaintiff [had] exhausted his administrative remedies with respect to [that] claim").

Third, insofar as plaintiff seeks injunctive relief directing one or more officials to discontinue certain misconduct, the request is, in essence, a request that these officials obey the law. "Obey the law" injunctions are vague, do not require a defendant to do anything more than that already imposed by law, subject the defendant to contempt rather than statutorily prescribed sanctions, and are not readily capable of enforcement. As such, these injunctions are not favored. *N.L.R.B. v. Express Pub. Co*., 312 U.S. 426, 435-36 (1941); *see also Rowe v. New York State Division of Budget*, No. 1:11-CV-1150 (LEK/DRH), 2012 WL 4092856, at *7 (N.D.N.Y. Sept. 17, 2012); *New York v. Shinnecock Indian Nation*, 560 F.

Supp. 2d 186, 189 (E.D.N.Y. 2008). According to the Second Circuit, "'[u]nder Rule 65(d), an injunction must be more specific than a simple command that the defendant obey the law.'" *S.C. Johnson & Son, Inc. v. Clorox Co.*, 241 F.3d 232, 240 (2d Cir. 2001) (quoting *Peregrine Myanmar Ltd. v. Segal*, 89 F.3d 41, 51 (2d Cir. 1996)).

For all of these reasons, plaintiff's request for injunctive relief is denied without prejudice.

## V. FUTURE FILINGS

District courts have the "inherent authority to manage their dockets" to promote "the efficient and expedient resolution of cases." *Dietz v. Bouldin*, 579 U.S. 40, 47 (2016) (citations omitted). "Absent extraordinary circumstances, such as a demonstrated history of frivolous and vexatious litigation, . . . or a failure to comply with sanctions imposed for such conduct, . . . a court has no power to prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure." *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 649 (2d Cir. 1987). However, an action cannot proceed unless and until service is completed. Although it is the Court's obligation to assist with service when a pro se prisoner is proceeding in forma pauperis, *see* Fed. R. Civ. P. 4(c)(3) (Marshals Service must be appointed to serve process when plaintiff is authorized to proceed in forma pauperis); 28 U.S.C. § 1915(d) ("[T]he officers of the court shall issue and serve all process and perform all duties in [in forma pauperis] cases."); *see also Wright v. Lewis*, 76 F.3d 57, 59 (2d Cir. 1996) ("By granting Wright leave to pursue his § 1983 claim in forma pauperis, Magistrate Smith

shifted the responsibility for serving the complaint from Wright to the court."); *Kavazanjian v. Rice*, No. 03-CV-1923, 2005 WL 1377946, at *2 (E.D.N.Y., June 6, 2005) (noting that "[f]or plaintiffs proceeding in forma pauperis . . ., the U.S. Marshal's Office—not the plaintiff—is primarily responsible for effecting service."), the Court cannot do so unless and until the pro se prisoner has provided the required documents. *See Carpio v. Luther*, No. 06-CV-0857, 2009 WL 605300, at *1 (W.D.N.Y. Mar. 9, 2009) (acknowledging the Court's "obligation to assist a pro se incarcerated litigant . . . to cause the summons and complaint to be served" but noting further that "the plaintiff nonetheless retains the obligation to provide the necessary information" for this to occur).[9]

Moreover, Rule 41(b) of the Federal Rules of Civil Procedure provides that a court may, in its discretion, dismiss an action based upon the failure of a plaintiff to prosecute it, or to comply with the procedural rules or orders of the court. Fed. R. Civ. P. 41(b); *see also Link v. Wabash R.R. Co*., 370 U.S. 626 (1962). This power to dismiss may be exercised when necessary to achieve orderly and expeditious disposition of cases. *See Freeman v. Lundrigan*, No. 95-CV-1190 (RSP/RWS), 1996 WL 481534, at *1 (N.D.N.Y. Aug. 22, 1996).

In light of the foregoing, and the cumbersome nature of plaintiff's pleading, which has resulted in this Court already spending considerable time on this matter, plaintiff is advised that he must provide the Court with all necessary copies of his complaint in order for this case

[9] Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, in the absence of a showing of good cause, "[i]f a defendant is not served within 90 days after the complaint is filed, the court—on motion or on its own after notice to the plaintiff—must dismiss the action without prejudice against that defendant or order that service be made within a specified time."

to proceed. Plaintiff is further advised that the Court will not (1) consider any further submissions from him until after receipt of the copies necessary for service, or (2) accept any further pleading submissions from him until after the completion of service, at which point any further amendment must identify any remaining "Doe" officials in this case, and be limited to the events discussed in the original complaint.

## VI. CONCLUSION

**WHEREFORE**, it is hereby

**ORDERED** that plaintiff's IFP Application (Dkt. No. 5) is **GRANTED**.[10] The Clerk shall provide the superintendent of the facility, designated by plaintiff as his current location, with a copy of plaintiff's authorization form (Dkt. No. 6), and notify the official that this action has been filed and that plaintiff is required to pay the entire statutory filing fee of $350.00 pursuant to 28 U.S.C. § 1915; and it is further

**ORDERED** that the Clerk shall provide a copy of plaintiff's authorization form (Dkt. No. 6) to the Financial Deputy of the Clerk's Office; and it is further

**ORDERED** that the following Section 1983 claims **SURVIVE** sua sponte review and require a response: (1) plaintiff's First, Third, Sixth, Seventh, Eleventh, and Thirteenth Retaliation Claims; and (2) plaintiff's First, Second Fourth, and Sixth Failure-to-Protect Claims; and it is further

[10] Plaintiff should note that although his IFP Application has been granted, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

**ORDERED** that plaintiff's remaining Section 1983 claims and ADA claims are **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted;[11] and it is further

**ORDERED** that the Clerk shall **TERMINATE** all defendants other than Allen, Charly, Corrections Officer Wilcox, Giddins, Corrow, Tamer, Poiner, Reyes, Corrections Officer John Doe #1, and Corrections Officer John Doe #2; and it is further

**ORDERED** that upon receipt from plaintiff of the documents required for service, the Clerk shall issue summonses and forward them, along with eight copies of the complaint, to the United States Marshal for service upon defendants Allen, Charly, Corrections Officer Wilcox, Giddins, Corrow, Tamer, Poiner, and Reyes.[12] The Clerk shall forward a copy of the summons and complaint by electronic mail to the New York State Attorney General's Office, together with a copy of this Decision and Order; and it is further

**ORDERED** that upon the completion of service, a response to the complaint be filed by defendants Allen, Charly, Corrections Officer Wilcox, Giddins, Corrow, Tamer, Poiner, and

[11] Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint. Any amended complaint, which shall supersede and replace the original complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant which plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised. Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure. Plaintiff's deadline to amend his pleading as a matter of course is set forth in Rule 15(a) of the Federal Rules of Civil Procedure. Should plaintiff seek to pursue any of the claims dismissed without prejudice, he is advised that the Court will not allow him to introduce any new or supplemental claims that were not included in the operative pleading. Rather, for the sake of judicial efficiency, any such claims must be the subject of a new action.

[12] The Clerk will not issue a summons for the remaining "Doe" defendants because service cannot be effectuated on unidentified individuals.

Reyes, or their counsel, as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that plaintiff must take reasonable steps to ascertain the identity of "Corrections Officer John Doe #1" and "Corrections Officer John Doe #2" through discovery, and when identified, seek to amend the complaint to add these individuals as defendants in this action pursuant to Federal Rule of Civil Procedure 15(a). The failure to timely name these officials as defendants shall result in their dismissal from this action pursuant to Rules 4(m) and 41(b) of the Federal Rules of Civil Procedure; and it is further

**ORDERED** that plaintiff's Motion for Injunctive Relief (Dkt. No. 3) is **DENIED without prejudice** as set forth above; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261-7367. Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in plaintiff's address; his failure to do so may result in the dismissal of this action**; and it is further

**ORDERED** that the Clerk of the Court shall provide plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam); and it is further

**ORDERED** that the Clerk shall serve a copy of this Decision and Order on plaintiff.

**IT IS SO ORDERED**.

Dated: October 16, 2026
Syracuse, NY

Brenda K. Sannes
Chief U.S. District Judge